THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BETTY J. MILLER,                          :
                                          :
            **Plaintiff**                 :
                                          :        **3:13-CV-02348**
     **vs.**                              :
                                          :        **(Judge MARIANI)**
CAROLYN W. COLVIN, ACTING                 :
COMMISSIONER OF SOCIAL                    :
SECURITY,                                 :
                                          :
            **Defendant**                 :

## MEMORANDUM

### Background

The above-captioned action is one seeking review of a decision of the

Commissioner of Social Security ("Commissioner") denying Plaintiff Betty J. Miller's claim

for social security disability insurance benefits and supplemental security income

benefits.

On May 10, 2011, Miller filed protectively[1] an application for disability

insurance benefits and on May 12, 2011, an application for supplemental security income

benefits. Tr. 12, 58-59, 170, 188, and 223.[2] The applications were initially denied by the

Bureau of Disability Determination[3] on July 19, 2011. Tr. 79-88. On August 15, 2011,

Miller requested a hearing before an administrative law judge. Tr. 94. The request was

---

1.    Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2.    References to "Tr._" are to pages of the administrative record filed by the Defendant as part of the Answer on November 26, 2013.

3.    The Bureau of Disability Determination is a state agency which initially evaluates applications for disability insurance and supplemental security income benefits on behalf of the Social Security Administration. Tr. 80 and 85.

granted and a hearing held on February 7, 2012. Tr. 12 and 25-57.  On April 19, 2012,

the administrative law judge issued a decision denying Miller's applications. Tr. 12-20.

As will be explained in more detail *infra* the administrative law judge found that Miller

failed to prove that she met the requirements of a listed impairment or suffered from

work-preclusive functional limitations. Id.  Instead Miller had the ability to perform a

limited range of light work,[4] including as a child care attendant, laundry worker, mail clerk

---

4.    The terms sedentary, light, medium, heavy and very heavy work are defined in the
regulations of the Social Security Administration as follows:

> (a) *Sedentary work.* Sedentary work involves lifting no more than 10
> pounds at a time and occasionally lifting or carrying articles like docket
> files, ledgers, and small tools.  Although a sedentary job is defined as one
> which involves sitting, a certain amount of walking and standing is often
> necessary in carrying out job duties.  Jobs are sedentary if walking and
> standing are required occasionally and other sedentary criteria are met.

> (b) *Light work.*  Light work involves lifting no more than 20 pounds at a
> time with frequent lifting or carrying of objects weighing up to 10 pounds.
> Even though the weight lifted may be very little, a job is in this category
> when it requires a good deal of walking or standing, or when it involves
> sitting most of the time with some pushing and pulling of arm or leg
> controls.  To be considered capable of performing a full or wide range of
> light work, you must have the ability to do substantially all of these
> activities. If someone can do light work, we determine that he or she can
> also do sedentary work, unless there are additional limiting factors such
> as  loss of fine dexterity or inability to sit for long periods of time.

> (c) *Medium work.*  Medium work involves lifting no more than 50 pounds at
> a time with frequent lifting or carrying of objects weighing up to 25 pounds.
> If someone can do medium work, we determine that he or she can do
> sedentary and light work.

> (d) *Heavy work.*  Heavy work involves lifting no more than 100 pounds at a
> time with frequent lifting or carrying of objects weighing up to 50 pounds.
> If someone can do heavy work, we determine that he or she can also do
> medium, light, and sedentary work.

> (e) *Very heavy work.*  Very heavy work involves lifting objects weighing
> more than 100 pounds at a time with frequent lifting or carrying of objects
> weighing 50 pounds or more.  If someone can do very heavy work, we
> determine that he or she can also do heavy, medium, light and sedentary
> work.

(continued...)

and hostess. Tr. 19-20. On May 22, 2012, Miller filed a request for review with the Appeals Council and after over 14 months had elapsed the Appeals Council on August 1, 2013, concluded that there was no basis upon which to grant Miller's request for review. Tr. 1-4 and 7-8.

Miller then filed a complaint in this court on September 10, 2013. Supporting and opposing briefs were submitted and the appeal became ripe for disposition on February 27, 2014, when Miller elected not to file a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Miller met the insured status requirements of the Social Security Act through December 31, 2011. Tr. 23-24 and 138. In order to establish entitlement to disability insurance benefits Miller was required to establish that she suffered from a disability on or before that date. 42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Supplemental security income is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income. Insured status is irrelevant in determining a claimant's eligibility for supplemental security income benefits.

---

4.    (...continued)

20 C.F.R. § 404.1567.

3

Miller, who was born in the United States on May 15, 1961,[5] obtained a General Equivalency Diploma (GED) in May 1979, and can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 29-30, 58, 190, 192 and 207. Before she withdrew from school, Miller attended regular education classes. Tr. 192. After withdrawing from school and obtaining a GED Miller did not complete "any type of special job training, trade or vocational school." Id.

Miller's work history covers 32 years and at least 32 different employers. Tr. 145-154. The records of the Social Security Administration reveal that Miller had earnings in the years 1975-1980, 1983 through 2002, 2005 and 2007 through 2011. Tr. 143, 171 and 173-174. Miller's reported annual earnings ranged from a low of $89.26 in 1977 to a high of $14,254.40 in 2010. Id. Miller's total earnings were $128,603.24. Id.

Miller has past relevant employment[6] as (1) a home health attendant which was described by a vocational expert as semi-skilled, medium work as generally performed in the economy and heavy work as actually performed by Miller and (2) a child care attendant described as semi-skilled, light work as generally performed but at least medium as actually performed by Miller. Tr. 19, 49 and 51.

---

5. At the time of the administrative hearing held Miller was 50 years of age. Under the Social Security regulations a person 50 to 54 years of age is considered a "person closely approaching advanced age." 20 C.F.R. § 404.1563(c). The Social Security Administration considers a claimant 50 to 54 who has a severe impairment and limited work experience as someone who may not be able to adjust to other work. Id.

6. Past relevant employment in the present case means work performed by Miller during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

4

Miller in her applications for disability insurance benefits and supplemental security income benefits claims that she became disabled on April 13, 2011, as the result of an injury to her back. Tr. 12, 60, 170 and 188. She lists her disabling impairments as obesity[7] and degenerative disc disease of the lumbosacral spine[8] accompanied by radiculitis.[9] Tr. 30; Doc. 7, Plaintiff's Brief, p. 1.

---

7.   The record reveals that Miller is 5'2" tall and weighs 230 pounds. Tr. 191. An individual of such height and weight has a body mass index of 42.1 and is considered morbidly obese. Center for Disease Control and Prevention. Healthy Weight, Adult BMI Calculator, http://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_ calculator/bmi_calculator.html (Last accessed September 5, 2014). Adults with a BMI of 30 or higher are considered obese. Assessing Your Weight, Center for Disease Control and Prevention, http://www.cdc.gov/healthyweight/assessing/index.html (Last accessed September 5, 2014). Individual who have a BMI of 40 or above are considered morbidly obese and prone to serious health problems.Obesity, Definition, Mayo clinic staff, http://www.mayoclinic.org/diseases-conditions/obesity/basics /definition/con-20014834 (Last accessed September 5, 2014); What is Morbid Obesity? University of Rochester Medical Center, Highland Hospital, Bariatric Surgery Center,http://www.urmc.rochester.edu/highland/departments-centers/bariatrics/right-for-you/morbid-obesity.aspx (Last accessed September 5, 2014).

8.   The spine consists of several elements including vertebral bodies and intervertebral discs. The intervertebral discs (made of cartilage) are the cushions (shock absorbers) between the bony vertebral bodies that make up the spinal column. Each disc is made of a tough outer layer (annulus fibrosus) and an inner core composed of a gelatin-like substance (nucleus pulposus).
    Degenerative disc disease is the wear and tear and breakdown of the intervertebral discs as a person grows older.  It is a process that can result from the dehydration of the discs as well as an injury to the spine. The breakdown of the intervertebral discs can result in discs bulging, protruding or herniating as well as the inner gelatin-like core of the disc extruding outside the outer layer. These conditions sometimes obstruct the openings (foramen) along the spine through which nerve roots exit. This condition is known as neural foraminal narrowing or stenosis. They can also result in a narrowing of the spinal canal or spinal stenosis. Such bulges, protrusions and herniations if they contact nerve tissue can cause pain.

9.   Radiculitis is defined as "inflammation of the root of a spinal nerve, especially that portion of the root which lies between the spinal cord and the intervertebral canal." Dorland's Illustrated Medical Dictionary, 1571 (32nd Ed. 2012).

5

For the reasons set forth below we will remand the case to the Commissioner for further proceedings.

**Standard of Review**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more

6

than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).  Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not

7

> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work. For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in significant
> numbers either in the region where such individual
> lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability

insurance and supplemental security income claims. See 20 C.F.R. §404.1520 and 20

C.F.R. § 416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner

to consider, in sequence, whether a claimant (1) is engaging in substantial gainful

activity,[10] (2) has an impairment that is severe or a combination of impairments that is

severe,[11] (3) has an impairment or combination of impairments that meets or equals the

requirements of a listed impairment,[12] (4) has the residual functional capacity to return to

---

10. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

11. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2).

12. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have the impairment or combination of impairments that meets or equals a listed impairment, the
(continued...)

his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[13]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**Medical Records**

Before we address the administrative law judge's decision and the arguments of counsel, we will review Miller's medical records. Some of the medical records are handwritten and only partially legible, particularly Miller's physical therapy records.

The medical records reveal that Miller suffered an injury to her back in late March and mid-April, 2011. Tr. 265, 280, 337, 446-450 and 466-468. The first injury was

---

12. (...continued)
sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

13. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

sustained when she fell down a flight of stairs at her home. Tr. 446. The second injury occurred when she was lifting a mattress while working as a home health attendant. Tr. 31, 191 and 280. The work-related injury occurred on or about April 13, 2011. Tr. 280 and 337. Miller has not worked since April 13, 2011. Tr. 191.

After the first injury Miller received initial treatment at a hospital emergency department and then had a follow-up appointment with John F. Pagnotto, D.O, two days later on March 28, 2011. Tr. 446. A physical examination performed by Dr. Pagnotto revealed tender paralumbar muscles[14] bilaterally and Dr. Pagnotto observed that Miller had difficulty getting on the examination table because of back pain. Tr. 449. Dr. Pagnotto's diagnostic assessment was that Miller suffered a back contusion and he prescribed pain medications. Id. At an appointment with Dr. Pagnotto on April 11, 2011, Miller reported that she was "doing very well," her back had improved and she had no new complaints. Tr. 466. A physical examination revealed that Miller had no focal sensory or motor deficits and her gait and reflexes were normal. Tr. 468.

As stated above, Miller suffered a second injury on April 13th. However, our review of the medical records did not reveal the record of Miller's initial treatment for this injury. Instead there is a medical record of an appointment at Juniata Valley Occupational Health dated April 21, 2011, which reveals that Miller went home after the injury, took the anti-inflammatory pain medication Excedrin and then sought treatment from a physician identified as Dr. Murray who prescribed the sleep aid Soma, nonsteroidal anti-inflammatory medications and the narcotic pain medication Vicodin. Tr. 280. Miller also underwent a series of x-rays of the lumbar spine on April 14, 2011, which revealed degenerative disc disease at the L4-L5 levels of the lumbar spine but no other significant

---

14. The paralumbar muscles are the muscles that run parallel to the spinal column. They are also know as the paraspinal muscles.

abnormalities. Tr. 337. The appointment at Juniata Valley Occupational Health was with a certified registered nurse practitioner and a physical examination performed by that nurse revealed a positive straight leg raising test on the left in a sitting position,[15] reduced ankle and knee reflexes bilaterally, tenderness of the lumbar spinous process[16] at the L4 and L5 levels, tenderness of the paraspinal muscles to the left and obesity. Tr. 280. Otherwise the results of the examination were essentially normal, including Miller was "ambulating well." Id. The nurse issued a "Return to Work Report" which restricted Miller to lifting no more than 10 pounds and precluded Miller from bending, twisting, climbing, pushing, pulling or stooping. Tr. 265. Miller was also referred to physical and occupational therapy. Id.

The record reveals that Miller had physical therapy at HealthSouth Nittany Valley Rehabilitation Hospital, Pleasant Gap, Pennsylvania, from April 22 to May 24, 2011. Tr. 286-303 and 369. During this period of time Miller had at least 13 therapy sessions and progress reports consistently revealed that Miller had extremely limited lumbar range of motion particularly with respect to forward bending at the waist (flexion).[17] Tr. 286-287 and 289.

---

15.    The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc. The patient, either lying or sitting with the knee straight, has his or her leg lifted. The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated -discs-straight-leg-raise (Last accessed September 9, 2014).

16.    The spinous process is the bone that protrudes and that can be felt when a finger is run along the spine. Spinal muscles attach to this process.

17.    On May 18, 2011, Miller's range of motion for lumbar flexion was 28 degrees. Tr. 289. Normal lumbar spine flexion is from 80 to 105 degrees and extension 25 to 60 (continued...)

11

On April 28, 2011, Miller had an appointment with John W. Gehman, M.D., at Juniata Valley Occupational Health at which she complained of persistent back pain. Tr. 279. A physical examination revealed that Miller had tenderness over the lumbar spinous processes at the L5 level. Id. Otherwise, the results of the physical examination were essentially normal. Id. Dr. Gehman opined that Miller had a significant lumbar strain and prescribed pain medications and physical therapy. Id. Dr. Gehman also issued a "Return to Work Report" which restricted Miller to lifting no more than 10 pounds and precluded her from bending or twisting. Tr. 264.

On May 26, 2011, Miller underwent an MRI of the lumbar spine which revealed a "small posterior annular fissure at L3/L4 without protrusion" and a "[v]ery narrowed desiccated bulging disc at L4/L5 with mild foraminal encroachment." Tr. 278.

From May 5, 2011, through January 26, 2012, Miller had 14 appointments at Juniata Valley Occupational Health with either Dr. Gehman or a certified registered nurse practitioner. Tr. 252-263, 266-278, 628-629 and 631-632. Dr. Gehman and the nurse after performing physical examinations repeatedly issued "Return to Work Reports" which precluded Miller from engaging in any bending or twisting. Id. The reports indicate that from May through July 5, 2011, Miller was prohibited from lifting more than 10 pounds;[18] and from July 15th through January 26, 2012, she was prohibited from lifting

_____

17.   (...continued)
degrees. Normal Ranges of Motion Figures (in degrees), MLS Group of Companies, Inc., http://www.mls-ime.com/articles/GeneralTopics/Normal%20Ranges%20of% 20Motion.html (Last accessed March 26, 2014). However, the forms utilized by the Bureau of Disability Determination state that normal lumbar range of motion for flexion is 90 degrees. Tr. 393.

18.   Two of the reports during this period specifically state that she was precluded
(continued...)

12

more than 20 pounds. Id.   Repeatedly it was noted that Miller was obese. Id.   Also, on

January 5, 2012, a physical examination performed by a nurse revealed that Miller's

forward flexion was limited to 70 degrees and lateral bending to 10 to 15 degrees;[19] she

had a positive straight leg raising test on the right in the sitting position; and she was

obese.  Tr. 631.

　　　　　From June 8, 2011 though January, 2012, in addition to treatment and

examinations by Dr. Gehman and a nurse practitioner at Juniata Valley Occupational

Health, Miller was examined and treated by several other physicians including Jyotish

Grover, M.D., a pain management specialist. Tr. 239, 241-246, 248, 479-481, 486, 515,

618 and 660.   Miller was referred to Dr. Grover by Dr. Gehman. Tr. 479.   A physical

examination of Miller performed by Dr. Grover on June 8, 2011, revealed that Miller had

an antalgic gait;[20] her forward flexion of the lumbar spine was limited to 20 degrees and

lateral bending and rotation to 10 degrees. Tr. 480.  Miller had spinous process

tenderness at the L3 through the S1 levels of the lumbosacral spine; she had marked

tenderness of the paraspinal muscles at the L5-S1 levels; and she had a positive straight

leg raising test on the right. Tr. 480-481.  Dr. Grover's diagnostic assessment was that

Miller suffered from lumbosacral radiculitis; degenerative disc disease with a disc

disruption; post laminectomy syndrome; and body deconditioning. Tr. 481.  Dr. Grover

---

18.  (...continued)
from engaging in any lifting. Tr. 259-260.

19.  The forms utilized by the Bureau of Disability Determination state that normal
lumbar range of motion for lateral bending is 20 degrees.  Tr. 393.

20.  Antalgic is defined as "counteracting or avoiding pain, as a posture or gait
assumed so as to lessen pain." Dorland's Illustrated Medical Dictionary, 97 (32nd Ed.
2012).

recommended epidural steroid injections. Id. The first such injection was administered on June 10, 2011, by Dr. Grover with some temporary improvement in Miller's pain. Tr. 239 and 486. At an appointment on June 28, 2011, a physical examination by Dr. Grover revealed that Miller's forward flexion was 50 degrees and her side bending and rotation was 10 degrees to the left and 5 degrees to the right. Tr. 486. Dr. Grover noted that pain was elicited with "upper torso movements." Id. Dr. Grover's diagnostic assessment essentially remained the same. Id. Dr. Grover administered steroid injections to Miller's lumbar spine in July, August and September, 2011. Tr. 241-244.

At an appointment with Dr. Grover on September 20, 2011, Miller reported no relief of symptoms and that her pain persisted in her right lower back, hip, buttock and posterior thigh. Tr. 245. She described the pain as a constant throbbing, aching and tingling sensation. Id. A physical examination revealed that Miller was limited to 70 degrees of forward flexion and 10 degrees of lateral bending and rotation to the right. Id. Dr. Grover reported that imaging studies revealed "a central disc protrusion at L3-L4 with an annular tear, as well as a disc protrusion at L4-5 with bilateral neuroforaminal encroachment." Id. Dr. Grover's diagnostic assessment essentially remained the same and he recommended additional injections which were administered on September 22, 2011. Tr. 245-246. At an appointment with Dr. Grover on October 11, 2011, Miller reported that she received only temporary pain relief from the injections. Tr. 515. Dr. Grover again administered injections on October 27, 2011, and at an appointment on December 13, 2011, Miller reported no relief in her pain symptoms. Tr. 248 and 618. A physical examination performed by Dr. Grover on December 13th revealed that Miller's forward flexion was limited to 70 degrees and lateral bending and rotation to 10 degrees

14

on the right and 15 degrees on the left. Tr. 618.   Dr. Grover also reported that

electromyography studies revealed that Miller suffered from chronic right S1

radiculopathy.[21] Id.   Dr. Grover's diagnostic assessment remained essentially the same

and he referred Miller to a neurosurgeon for an evaluation. Id.

       The neurosurgical evaluation was performed on or about February 17,

2012, by Barry B. Moore, M.D., in Mechanicsburg, Pennsylvania. Tr. 664-665. Dr. Moore

reported that when Miller was asked to walk on her heels and toes[22] she had some

weakness in the feet and when asked to get up from sitting in a chair had moderate to

severe weakness in the lower extremities. Tr. 665. Dr. Moore noted sensory loss on

Miller's right foot and after reviewing MRI scans opined that Miller suffered from multilevel

lumbar stenosis worse on the right side at L3-L4, L4-L5 and L5-S1. Id. Dr. Moore stated

that Miller's neurological findings were compatible with progressive lumbar stenosis and

recommended surgical intervention, i.e., a lumbar laminectomy and decompression at

L3-L4, L4-L5 and L5-S1. Id.

---

21.   Radiculopathy is a condition where one or more nerves or nerve roots are
affected and do not work properly. The nerve roots are branches of the spinal cord.
They carry signals to the rest of the body at each level along the spine. Radiculopathy
is a result of disc herniation or an injury causing foraminal impingement of an exiting
nerve (the narrowing of the channel through which a nerve root passes). See, generally,
Radiculopathy, MedicineNet.com, http://www.medicinenet.com/radiculopathy/article.
htm (Last accessed September 9, 2014).  A herniated disc is one cause of
radiculopathy. Id.

22.   The heel walk test requires the patient to walk on his heels. The inability to do so
suggests L4-5 nerve root irritation. The toe walk test requires the patient to walk on his
toes. The inability to do so suggests L5-S1 nerve root irritation. Clinical Examination
Terminology, MLS Group of Companies, Inc., https://www.mls-ime.com/articles/
GeneralTopics/Clinical%20Examination%20Terminology.html (Last accessed
September 9, 2014).

The record does not reveal any physical functional assessment from a state agency physician contradicting the assessment of Dr. Gehman that Miller should not engage in any bending or twisting.

## Discussion

The administrative law judge went through the five-step sequential evaluation process and found at step five that Miller was not disabled. The severe impairments found at step two were obesity and degenerative disc disease of the lumbar spine with radiculitis. Tr. 14. At step three, the administrative law judge found that Miller's impairments did not meet or medically equal the requirements of any listed impairment. Tr. 15-16. With respect to the residual functional capacity the administrative law judge found that Miller could perform a limited range of light work and was not precluded from performing her past relevant work as a child care attendant. Tr. 15-19. The administrative law judge included in Miller's residual functional capacity the ability to stoop occasionally. Tr. 16. In setting this residual functional capacity, the administrative law judge rejected the opinion of Dr. Gehman that Miller could not engage in any bending or twisting but referred to no contrary medical opinion. The administrative law judge stated that he gave no weight to Dr. Gehman's postural recommendations because it was "not unreasonable to expect the claimant to be able to bend and stoop occasionally, especially since she does not fully dispute Dr. Gehman's opinions relating to her lifting capacity." Tr. 17-18 n.4.

In the alternative to performing her past relevant work, the administrative law judge at step five of the sequential evaluation process based on the above residual functional capacity and the testimony of a vocational expert found that Miller could

16

perform the light work positions of laundry worker, mail clerk and hostess and that there were a significant number of such positions in the state and national economies. Tr. 20.

Miller argues that the administrative law judge erred (1) by failing to find at step three of the sequential evaluation process that her impairments met or equaled a listed impairment, and (2) by failing to appropriately consider the medical evidence. We have thoroughly reviewed the record in this case which consists of 726 pages and find substantial merit in Miller's second argument.[23]

The administrative law judge rejected the opinion of Dr. Gehman, a treating physician regarding the physical functional abilities of Miller. The preference for the treating physician's opinion has been recognized by the Court of Appeals for the Third Circuit and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18

---

23. We find no merit in Miller's first argument because Listing 1.04, Disorders of the Spine, asserted by Miller requires, inter alia, a finding of straight leg raising tests both in the sitting and supine positions and an inability to ambulate effectively. The inability to ambulate effectively is defined at 1.00B2b as follows:

> Inability to ambulate effectively means an extreme limitation of the ability to walk, i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of handheld assistive device(s) that limits the functioning of both upper extremities.

Examples of an "inability to ambulate effectively" include needing a walker, crutches, or two canes to walk; not being able to walk a block at a reasonable pace on rough or uneven surfaces; an inability to use public transportation; or being unable to carry out routine ambulatory activities(i.e., shopping, banking, or climbing a few steps at a reasonable pace with the use of a single handrail). Id. (citing id. at (2)). The record is devoid of such evidence.

17

(3d Cir. 2000). In choosing to reject the evaluation of a treating physician, an administrative law judge may not make speculative inferences from medical reports and may reject treating physician's opinions outright only on the basis of contradictory medical evidence. Id. An administrative law judge may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion. Id. An administrative law judge may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id. As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong." Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

In this case the administrative law judge rejected the opinion of Dr. Gehman regarding Miller's postural limitations and did not point to an assessment by a treating or examining physician specifying Miller's work-related physical functional abilities, such as sitting, standing, walking, lifting, and carrying, but engaged in his own lay analysis of the bare medical records and Miller's credibility. The reasons given by the administrative law judge for rejecting the opinion of Dr. Gehman were inadequate. The administrative law judge speculated that someone who could lift up to 20 pounds could occasionally bend and stoop. Occasional is defined as up to 1/3 or an 8-hour workday or 2.67 hours. Dr. Gehman did not state that Miller could engage in occasional lifting but merely stated that Miller could lift a maximum of 20 pounds. Consequently, the administrative law judge engaged in mere speculation regarding Miller's capacity to bend and stoop. The medical

18

records clearly indicate that Miller was morbidly obese and had range of motion

limitations with respect to forward and lateral flexion as well as rotation. We cannot

conclude based on the record that Dr. Gehman's limitations relating to bending and

twisting which he consistently imposed were erroneous. The administrative law judge

gave an inadequate explanation for rejecting those limitations.

We recognize that the residual functional capacity assessment must be

based on a consideration of all the evidence in the record, including the testimony of the

claimant regarding her activities of daily living, medical records, lay evidence and

evidence of pain. See Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112,

121-122 (3d Cir 2000). However, rarely can a decision be made regarding a claimant's

residual functional capacity without an assessment from a physician regarding the

functional abilities of the claimant. See Doak v. Heckler, 790 F.2d 26, 29 (3d

Cir.1986)("No physician suggested that the activity Doak could perform was consistent

with the definition of light work set forth in the regulations, and therefore the ALJ's

conclusion that he could is not supported by substantial evidence."); 20 C.F.R. §

404.1545(a). As two commentators have explained:

> Sometimes administrative law judges assert that they -
> and not physicians - have the right to make residual
> functional capacity determinations. In fact, it can
> reasonably be asserted that the ALJ has the right
> to determine whether a claimant can engage in
> sedentary, light, medium, or heavy work. The ALJ
> should not assume that physicians know the Social
> Security Administration's definitions of those
> terms. Even though the RFC assessment draws from
> medical sources for support, it is ultimately an
> administrative determination based on those
> administrative definitions and is reserved to the
> Commissioner. However, the underlying determination
> is a medical determination, i.e., that the claimant can

19

> lift five, 20, 50, or 100 pounds, and can stand for
> 30 minutes, two hours, six hours, or eight hours.
> That determination must be made by a doctor.  Once
> the doctor has determined how long the claimant can
> sit, stand or walk, and how much weight the claimant
> can lift and carry, then the ALJ, with the aid of a
> vocational expert if necessary, can translate that
> medical determination into a residual functional
> capacity determination.  Of course, in such a situation
> a residual functional capacity determination is merely
> a mechanical determination, because the regulations
> clearly and explicitly define the various types of
> work that can be performed by claimants, based upon
> their physical capacities. Thus, while agency regulations
> provide the ultimate issues such as disability and RFC
> are reserved to the agency, it may not reject a
> physician's medical findings that determine the various
> components and requirements of RFC.

Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in

Federal Courts, 344-345 (2014)(emphasis added); see also Woodford v. Apfel, 93

F.Supp.2d 521, 529 (S.D.N.Y. 2000)("An ALJ commits legal error when he makes a

residual functional capacity determination based on medical reports that do not

specifically explain the scope of claimant's work-related capabilities."); Zorilla v. Chater,

915 F.Supp. 662, 667 (S.D.N.Y. 1996)("The lay evaluation of an ALJ is not sufficient

evidence of the claimant's work capacity; an explanation of the claimant's functional

capacity from a doctor is required."). The administrative law judge cannot speculate as to

a claimant's residual functional capacity but must have medical evidence, and generally a

medical opinion regarding the functional capabilities of the claimant, supporting his

determination. Id.; see also Yanchick v. Astrue, Civil No. 10-1654, slip op. at 17-19

(M.D.Pa. April 27, 2011)(Muir, J.)(Doc. 11); Coyne v. Astrue, Civil No. 10-1203, slip op. at

8-9 (M.D.Pa. June 7, 2011)(Muir,J.)(Doc. 21); Crayton v. Astrue, Civil No. 10-1265, slip

op. at 38-39 (M.D.Pa. September 27, 2011)(Caputo, J.)(Doc. 17); Dutton v. Astrue, Civil

No. 10-2594, slip op. at 37-39(M.D.Pa. January 31, 2012)(Munley, J.)(Doc. 14); Gunder v. Astrue, Civil No. 11-300, slip op. at 44-46(M.D.Pa. February 15, 2012)(Conaboy, J.)(Doc. 10).

        In this case there was no assessment of the functional capabilities of Miller from a physician which supported the administrative law judge's residual functional capacity assessment and the bare medical records and other non-medical evidence were insufficient for the administrative law judge to conclude that Miller had the ability to engage in occasional bending and stooping.

        Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings.

        An appropriate order will be entered.

Robert D. Mariani
United States District Judge

Date: September   , 2014

21